Our next case in the morning is the people of the state of Illinois, which is Paul Moriconi. The appellant is Hart for the Appalachian Brooks. You may proceed. May it please the court, counsel, my name is Katherine Hart and I represent the appellant Paul Moriconi. At issue in all three of the convictions in this case is a question of law. Did the state prove beyond a reasonable doubt that Paul Moriconi engaged in the affirmative acts necessary to convict on obstructing justice, concealing a fugitive, and aiding a fugitive? And the answer to this question is no. In order for the state to prove Paul Moriconi obstructed justice, the state had to prove that Paul induced Tim Laididge to conceal himself in Paul's apartment. The word induced is a strong word and according to the Oxford American Dictionary it means to prevail upon or persuade. Yet the state presented no evidence that Paul ever prevailed on or persuaded Tim Laididge to conceal himself. The state argues that the jury could have inferred that Paul induced Tim to conceal himself because Paul allegedly told Tim that he wouldn't say anything to the police when Paul went upstairs to bootleggers to talk to the police. But the state has the burden of proving every element of the charge beyond a reasonable doubt and Laididge's testimony was simply not proof enough of inducement. There was no persuasion for prevailing upon. In order for the state to prove Paul Moriconi guilty of concealing a fugitive or aiding a fugitive, the state had to prove that Paul concealed or aided Tim Laididge by an affirmative act. And they have not proven that affirmative act. The case law on concealing or aiding a fugitive is quite sparse. The two main cases that people cite to are People v. Donaldson, which is a Fourth District case, or People v. Thomas. In Donaldson, the court specifically found that because no evidence was introduced that the defendant had lied to anyone or refused to answer questions, that the state had failed to prove an affirmative act of concealment. Thomas is even more on point with this case because in Thomas, there was a shooting. The defendant was questioned about the shooter. And he gave a very vague description to the police of the shooter. And then a week later, when again questioned by the police, he told them that the shooter was in fact his first cousin. He was subsequently charged and convicted of concealing a fugitive. But the appellate court in that case found that the defendant's failure to give the police all of the information that he had about the shooter was not an affirmative act of concealment sufficient to sustain the charge. Well, in this case, didn't Morricone suggest to Laddidge that he stay in the apartment? There is no testimony that Paul Morricone ever suggested to Tim Laddidge that he stay in the apartment. The testimony that Tim Laddidge gave at the trial is that he left bootleggers with two other trucks. He hit something in the road. He turned around. He's not sure what he hit, but it might have been a human. At 2 a.m., he calls Paul Morricone and asks to stay in his apartment because he knows that Paul Morricone often allowed people to stay in his apartment. His apartment was below bootleggers. It happens to be in the basement, but it is a separate residence or apartment, a separate unit. Tim arrives at bootleggers and asks Paul Morricone if he can hide his truck in the beer garden, and Paul says no, just put it in the parking lot with the other cars. The state in their brief quotes language about back of the parking lot, but the testimony at trial is that his truck was just parked among the other cars that were still in the parking lot. He stays on the couch, and Paul goes back to bed. There's a knock at 3 a.m. Paul doesn't stir. Leydig doesn't get up, although he does hear the knock, and then there's another knock at 6.45. Paul answers the door in his boxers and tells the person that he'll meet him upstairs in the bar, and he puts on clothes, and then he goes upstairs. Now, the testimony from Leydig is both that Paul said, well, it's the police, I'm going to go upstairs, I'm not going to say anything, but then Leydig also testified that he didn't know on cross-examination, and this is in my brief, that he didn't know it was the police until Paul went upstairs and he went over and looked at the surveillance equipment and could see that there were police officers. There's no testimony from Tim that Paul ever told him to hide or conceal himself. That's simply the inference that the state would like to draw from what occurred. Did Morricone tell him to wash his truck off? Tim Leydig testifies at trial that Paul told him to wash his truck off, although Leydig did not initially tell the police that when he was interviewed. Morricone knew that the accident happened and the three trucks had hit the individual. Well, let me just back up a second, Justice Cook. As to the truck, regardless of whether Morricone may or may not have told Leydig, and we're not conceding that he did, Leydig was not a great witness, and his testimony, as I said, initially he didn't tell the police, it wasn't until later. But even if that was the case, that occurs later. It occurs after the police are already gone, and so it has nothing to do with whether Morricone induced him to conceal himself in his apartment when the police were there. As to your, I'm sorry, what was your... Oh, did he know about the accident? Well, it's not clear how much he knew about the accident. Leydig testifies at trial that he told Morricone that he hit an animal or possibly a human. And that's all he knows. That's all that Leydig testifies to. He doesn't go into detail about what he told Morricone. Morricone doesn't testify. So, what we have is the police officers come to bootleggers and they talk to Paul Morricone because he's the owner of the bar that is near the accident. And they ask him about Timothy Dunbar, who was the one person who stayed at the scene of the crime. And they ask him about Timothy Dunbar and who he was with that night and who he left with. But they don't ask him any information about the accident. And as far as we know, all Leydig told Morricone was, I may or may not have hit a human or an animal. And he testified that he said both. So, Paul Morricone was never asked specifically about the accident and he didn't really have any information to give because he wasn't there. And even from Leydig's own testimony, he didn't know that much. When Leydig went back to the bootleggers, Leydig talked to Morricone and said there had been an object in the road and that Oak had thought it was a human. And Leydig and Morricone talked about what to do? Leydig just says that he talks to him for an hour. There is not any testimony really about what that conversation entailed. And Leydig wanted to hide his truck by moving it inside the gate of the beer garden. Morricone said that was not a good idea, that if he was going to move the truck, move it to the back of the parking lot. But the back of the parking lot is where all of the cars were parked. Leydig's trucks were according to the... But he's giving him advice on what to do. Do you hide it in the beer garden? No, I think you ought to move it to the back of the parking area. And then they have the hour discussion and then Leydig stays in the apartment. And then Morricone doesn't reveal that when the cops come to ask him about the accident. I don't believe that even in Leydig's testimony, that Morricone was giving him advice about the truck. I believe that Leydig said I would like to hide the truck in your beer garden and Morricone said no, put it with all the other cars in the parking lot. So it was more a response to Leydig's request to hide the truck. Well that's the way you see it, but why can't a jury see it a different way? Because the testimony was not that Morricone advised him. He just said no, don't put it in the beer garden, put it in the parking lot. But regardless, the charge is inducing somebody to conceal themselves. At best, Morricone was acquiescing to Leydig's request. It sounds to me like you're saying the defendant has to admit that it was his suggestion that caused the action that was taken. And we have circumstantial evidence in cases all the time. It's not correct that the defendant has to admit his guilt before he's convicted, is it? No, but there is a certain affirmative act necessary in all three of these charges. And it's more than simply saying yes, you can stay in my apartment, especially in the obstruction of justice charge. The way that the state charged the crime, they charged it that Paul Morricone had to induce Tim Leydig to conceal himself. And there is simply no testimony that he did induce him to conceal himself. He allowed Leydig to stay in his apartment. What did they talk about for an hour? Leydig doesn't tell us. Nobody tells us what they talked about for an hour. I don't know what they talked about for an hour, but it's the state's burden to prove that Paul Morricone induced Leydig. And the evidence is simply not there. Likewise, in the aiding and concealing a fugitive, we don't have any affirmative act. The police did not ask the right questions. If they said, is Leydig here, and Morricone had said no, then there would be a conviction. But when the police just say, do you know where the individuals are that were here? Who were the individuals who were here in the bar that evening? And Morricone does not mention the name of Leydig, who is currently inside the apartment? That's not enough? It's not enough. In this particular case, the police asked about Tim Dunbar and who was with Tim Dunbar and who left the bar. And Paul Morricone gave them some information. He did not lie. And the case law is that you have to do more than simply not provide all the information. Under People v. Thomas, in that case, the defendant, it was his first cousin who was the shooter. And the police, he didn't tell that to the police. He just said, gave a vague description of the man. And a week later, when he finally said, oh, well, the shooter was my cousin, and they ended up charging him. Well, the appellate court said, no, that's not enough. There has to be more than simply the failure to present the information. And in this case, the state didn't prove that affirmative act. Paul Morricone wasn't asked the right question. We may not like what Paul Morricone did. What he did may be morally distasteful. But it has to be more than simply morally distasteful. It wasn't a crime. The state did not prove. So Morricone knows that Latige ran over the guy in the street, or at least they think it was a guy. It could have been something else. Morricone has talked to Latige. Morricone has told Latige not to hide his truck. Morricone knows that Latige is staying in the apartment. And then when the police come to ask about the accident, and they ask who was in the bar, Morricone is allowed to not mention Latige's name. He's allowed to not mention Latige's name and not be charged with conciliating a fugitive. We may feel that that was not the right course morally, but it is not a crime. And that is really what is the bottom line here, is that there had to be more than what happened to prove all three of these counts. And there simply wasn't. It's a matter of legal sufficiency. The state did not prove those affirmative acts to sustain their charges. And that's basically the crux of the case. It's looking at these facts and seeing whether they prove an affirmative act. And if you look at the facts, they don't show an affirmative act of aiding or concealing or inducing to conceal. It simply is not there. And when they're looked at as a whole, it doesn't sustain the charge. If a lay person were here in the courtroom, do you think they'd think the law was not sufficiently specific or that it ought to be changed? I mean, as you've indicated, we feel that discomfort. Do you think this is a really high burden because that's the way the legislature wants it? Or they haven't contemplated this sort of situation? Well, Donaldson was decided in 1977. And the language that the court uses is, there's a fairly lengthy description of the common law, accomplice after the fact law, and federal law. And so the legislature certainly had a chance after Donaldson to change the statute, and they didn't do that. I think the idea is that in order to be guilty of a crime, you have to do more than simply acquiesce to letting somebody stay in your apartment. There has to be more. And I think that that's okay. There are areas of law where the public may not be entirely comfortable, but they can still recognize that there should be a line between criminal behavior and behavior that maybe we're not totally thrilled with. And that's the discussion that this court has in Donaldson at the end, where it talks about how often are you in a car where someone's breaking the law. However, and should they be charged as eating a fugitive or obstructing justice? Because they're there. And the answer to that is no. This court, if this court has no further questions. We do not. Then I'll reserve my remaining time. Thank you. Thank you. Ms. Brooks? May it please the court and counsel, my name is Anastasia Brooks, and I represent the people in this case. With respect to the obstructing justice charge, the element that's required to be proved beyond a reasonable doubt is the inducement, whether a defendant induced Lattage, who had material knowledge concerning crime, to conceal himself. And what happens here is the state's theory is that when the defendant instructed Lattage, excuse me, I have to leave to get some water. Pardon me, Your Honors. When the state, prior to the act of inducement that was charged, the defendant had instructed Lattage, telling, assuring him, I won't say anything to them about you, of course, referring to the police. Now, there is some evidence in the record that the defendant did not instruct Lattage to, like, run and hide in the beer cooler or do stuff like that. But there was, in fact, enough inducement in the assurance of, I'm not going to say anything to the police about you. Isn't there a substantial difference between an inducement and saying, I have information that I'm not going to share? Inducement means I'm bringing you in. I'm getting you to move from point A to point B. That's a whole different act. That's an active act as opposed to a passive act of saying, I'm not going to say what I know. I guess it's, I don't know that I see the claim as being that because the defendant was already concealed inside the basement apartment below bootleggers, that somehow there was nothing that the defendant could do to induce him to further conceal himself because he was already being concealed. I don't see that that's the issue. The issue is whether he induced him to further, to remain concealed when the police come knocking on the basement apartment door and he's essentially when, even at the point, even if he did not tell Lattage, the police are at the door, stay hiding. It's the case where the defendant asks the police, can you meet me upstairs? He goes upstairs, Lattage can see on the monitors from the security system, there are police officers there, he sees badges and guns, and he knows it's the police that are there interviewing Paul Marconi, the defendant. So at that point, Lattage has the assurance that Marconi's not going to turn him in. So that is... What about the testimony that Lattage, I think, and I think this is the way that Ms. Hart explained it, Lattage doesn't even know it's the police until he looks on the monitor, the surveillance monitor. Right, even if that were the case, knowing that he has this assurance... But the assurance of what? That he's not going to get turned in by Paul Marconi. But that's not what was said. He didn't say, I'm not going to turn you in to the police, I'm not going to talk to the police. He just says, I'm not going to say anything. I'll say nothing about you. If Lattage doesn't know that the police are the ones that are at the door, then he's not, even under your argument, he's not induced to keep concealing himself. I mean, I don't want to say anything about bootleggers, but maybe it's his girlfriend who wants to know where he is. And that Marconi is not sufficiently alert at that time of the morning after going to bed late and whatever that he could care less. He's not going to give information to anybody about who's crashing in his apartment. So unless Lattage knows that the police are there, you can't get to the inference that one would draw from, I'm not going to say anything. Or does he say, does he testify, Marconi turned to me and said, I'm not going to tell the police that you're down here. And I don't think that's the testimony. Well, what I have here is the question was, now did the defendant say anything to you prior to going upstairs to meet with the detectives? And the response by Lattage was, he said, and that's for the defendant, quote, I won't say anything to them about you. But the word detectives is in the question, not in the answer. Right. There's no reference that the them referred to the police, except for the fact that maybe it could be inferred. Except that you're a witness, it's the prosecution's witness. Right. But Lattage says he doesn't know it's the police. He says something like, I didn't know who it was until I looked at the monitor, and then I could see that these guys were cops. Right. But the inducement is, it doesn't matter whether he knew who it was at the door, he was saying, I'm not going to disclose, effectively assuring him he's not going to disclose his knowledge of the involvement of whomever's at the door. But very soon thereafter, he then seizes the police. But he remains concealed. And that was induced by the assurance, and that is the state's theory of the obstructing justice charge. It doesn't have to be at the very moment of the inducement, he's referring to detectives, or even Lattage knows it's detectives. He knows it's somebody who would be knocking on his apartment door at 645. I had a state's attorney used to knock on my door. I was a trial judge, and he called me and asked me, my wife, where I was. Well, he's in bed, it's 3 o'clock in the morning. Well, Lattage may not have been told by the defendant that it was the police, but the fact is he knows there was a serious accident not too far down the road, Toronto Road. There's a knock at 3 a.m. which Lattage is aware of. There's another knock again several hours later.  There were detectives who were investigating this recent accident, which happened not too far away. So the reference to them, I mean, did the police identify themselves when they knock on the door, or did they just simply knock on the door and expect, I mean, it would be a stretch to think that Lattage didn't know it was the police there, at least at the time their assurance was given. And even if that were not the case, he knew shortly thereafter when he saw the monitors. So there was sufficient inducement in order to prove an affirmative act of obstructing justice. So it was not a situation where the defendant claims that simply the defendant had acquiesced in him staying in the apartment. There was actually affirmative inducement. With respect to concealing a fugitive, the circumstances are that Lattage,  around the same time as Tim Dunbar at 1.45. Even knowing that, he claims to the police officers he didn't ask the right questions. But the questions the police asked were whether he knew anything about the accident. He also asked, the police actually specifically asked for the names of six to eight people that the defendant claimed were in the bar at closing, that was at 1 a.m. And the defendant also, the police specifically asked for the names of three to five people who had left at the same time as Dunbar, which would have included Lattage. Police also asked the defendant why these vehicles were in the parking lot. And rather than giving truthful answers to those questions, one of the replies that was quoted is simply that defendant claims that Max and maybe a guy named Mike were in the bar at closing. So it's not a situation where there's simply a failure to report a crime of which he was aware, that's like the Donaldson case, or simply that he refuses to provide any information whatsoever or remain silent, and that would be more like the Thomas situation. But in this case, it's not a situation where he's simply failing to report a crime or remaining silent or refusing to cooperate in the face of interrogation. He's actually lying to police by providing materially incomplete, essentially like half-truths. And if half-truths is half-true, then they're also half-false. And at least the false part of it is, in fact, affirming that Max is lying to police about concealing his knowledge of the crime that was committed. And he knew because Lavish told him that Hope was pretty sure that it was a human. Of course, these people were fairly drunk when they left the bar, and they didn't necessarily like Dunbar stop to turn around and take a look at the body. They simply... I think Lavish made the remark that he was more scared than ever. If he had think that he had just simply ran over a dog or a squirrel, he would have thought that he would have been so scared. He must have really known that this was, in fact, a human that he had run over, and that was why he went back to bootleggers following the incident. And although the fact that Lavish... the defendant instructed Lavish to watch his truck so no one would know anything, that's not part of the affirmative acts that's being charged, but yet that does go to the element of his intent to prevent Lavish's apprehension, which applies to the concealing and aiding of fugitives accounts. So in that case, that part of the evidence was very crucial, and the defendant is challenging the sufficiency of the evidence as to his intent to prevent apprehension. So the fact that he's telling him, go wash your truck off on the north end, of course these are on the south end of town on Toronto Road, so go to the other side of town and wash your truck off and no one will know anything. That really shows his intent to conceal, to prevent his apprehension. So with respect to the affirmative acts of aiding a fugitive, which refers to harboring, aiding, or concealing, in this case the defendant permitted Lavish to remain hidden in his basement apartment while arranging to meet the police upstairs. The police come knocking on the basement apartment door, and he says, would you mind if I talk to you upstairs? Go around, essentially, and I'll talk to you upstairs. So rather than letting the police in the apartment, where of course they would ask who's this person, and found out that it was Tim Lavish, and then they could have investigated what possibly Lavish had known, and it got on the trail that way. Instead they don't even know anything about Lavish's involvement that evening. So the act of preventing police from coming into the basement apartment and arranging to meet them upstairs instead, while also at the same time assuring Lavish that he's not going to tell the police anything, that constitutes harboring, aiding, or concealing the fugitive at that time. So we have in fact here three separate affirmative acts that constitute different physical acts for the purposes of the One Act One Crime Rule. So it's not a situation where simply acquiescing in Lavish's staying in the apartment is the only charged act, and this is charged three different ways. That's the defendant's theory of this. That argument is not supported by the text of the charges, or the state's analysis actually parses out what are the specific acts that were alleged and proved, and it shows that he actually does different things. He's inducing the concealment. He's arranging to meet the police upstairs. He also lied to the police about his knowledge of the accident and about giving them false and incomplete information, materially incomplete information about the identities of the patrons and what the purpose of the vehicles in the lot were. So for these reasons, the state requests this court to affirm the conviction and the court has no further questions. What would the charge be if Marconi just turned and looked at Lavish and did that and walked upstairs and told the detectives, I'm not answering any questions about anything. You guys woke me up. Get the hell out. Well, if he refuses, if he peeks open the door and then says, I'm not talking to you. No, no, he goes ahead and meets him upstairs, and then they start asking about an accident, and he says, I run this bar. I'm not talking to you guys. Leave. Let me go back to bed. Okay, well then that would be a different situation. Well, yeah, I know. Knock out the obstruction of justice counts. I'm sorry, not that one. The concealing of fugitive counts, because then it would fit more in line with the Thomas and Donaldson cases, where he's essentially remaining silent, failing to report an offense, but not actually lying to the police because he's not cooperating at all. It's a different situation to giving the appearance of cooperation, which is what he did here, the false appearance of cooperation, but yet actually not giving the police anything helpful. Did he say that that's a recounting of all the people that were there, or does he just say, well, so-and-so was here and so-and-so was here, but there might have been six or seven people. Well, it's definitely inference that if he's just naming two people that he doesn't remember or doesn't know the names of the other people, which would actually be Patlyn Falls, because he knows that Laddidge was involved and that Laddidge had been there and that Laddidge was in his basement. He wouldn't have a credible claim that he did not remember Laddidge had been there at the time. So for that reason, by simply just naming Max and maybe a guy named Mike, he's giving the appearance that he's providing helpful information and he's actually detracting police from their track of investigating this crime. He's deflecting Laddidge's involvement with affirmative acts, and that gives the false appearance of cooperation. And I think that is what constitutes concealing a fugitive rather than simply saying, I'm not going to say anything. To what extent did the failure of the police to ask the right questions bear on the analysis of what the defendant did here? Well, with respect to, again, this gets back, like Justice Connick's question, only to the concealing a fugitive count, not the others. But the claim is he didn't ask the right questions, the police didn't ask the right questions. If there had been a case in which the police did not ask anything pertinent to the investigation, just didn't really ask for the names, essentially when he says, do you know anything, I mean that's broad enough to say, well, if he's appearing to be cooperative but actually deflecting them, that's essentially lying to the police. That constitutes a crime. So I do not agree with the claim that the defendant made that somehow that he's being huge and careful in responding to the police without trying to affirmatively lie to them, but yet at the same time, what he is doing, the process of appearing cooperative, giving half-truths, giving materially incomplete information, that itself is very deceitful and detracted from the investigation. When you say detracted from the investigation, I think what you're saying is, well, if he provided an answer like Justice Connick suggested, I'm not going to tell you anything. That would have lighted some red lights and the police maybe would have done something else like gotten a warrant and searched bootleggers or whatever. But the answer he gave, like you say, detracted from the investigation. They thought, well, this guy doesn't know anything else, we'll just move on. And what the officers basically acknowledged is, before they got the surveillance videos from the apartment across the street from where the accident happened, they were at a dead end, that this investigation was going nowhere. And that was because Palmer O'Coney threw up this wall in front of the investigation, keeping them from getting the information that they were asking for quite directly. Give us the names, do you know anything, why are these vehicles here? And just appearing cooperative made them think. They, of course, once they got the surveillance videos, they thought, well, this is edited, this is incomplete, we think he's hiding something here. They do go get a search warrant at that point. And then they would have gotten in the basement where the computer equipment was. But at that time, Lattice had gone upstairs, talked to Bill Keaton, and then there was this joint discussion amongst them about, you need to call your parents, you need to get a lawyer. And then the parents and the lawyer then convinced Lattice to turn himself in to the police. So it wasn't a situation where the defendant just outright instructed, you need to call the police, you need to turn yourself in. There was some involvement of Keaton, and all this happens much later. So it's not a situation where the defendant did not intend to prevent Lattice's apprehension, simply because eventually there's this advice. He's part of the advice with Keaton to tell him, you need to get a lawyer, you need to call your parents, and essentially getting him out of bootleggers. Because he wasn't going to remain there forever. But he didn't have to remain inside bootleggers forever for the defendant to be guilty of these charged crimes. So with that, I thank you for your time and request this court to affirm. Thank you. Thank you, counsel. Rebecca? First of all, my understanding of when Sims went to Paul Marconi and met with him upstairs in bootleggers, he told Marconi that Marconi was not a suspect and they're here to get more information about the accident on Toronto Road. And then they specifically asked him questions about who was with Tim Dunbar and who left with Tim Dunbar. Now, the counsel tries to say that Thomas is not like this case, but in fact, the defendant and Thomas was questioned by the police and he gave them some information about the suspect. Vague information, including Ron as a first name. But he doesn't tell them that the shooter is, in fact, his cousin. So it's the exact same factual information as here, where the defendant is giving some information, not false information, some information, but not all of it. The other thing to remember here is that this took place... It seems to me there's a difference between not explaining a relationship and not disclosing that an individual who was a participant in the accident the cops are asking about is currently downstairs in the basement. But they didn't ask him about the accident. They were asking about Tim Dunbar and who was at the bar. They said, we're here about an accident. And Sim says that... Marconi did not know that the police were asking him about the accident up on Toronto Road where the fellow was run over? No, I'm not saying that, Justice Cook. I'm saying the police said, we're here about this accident on Toronto Road. And they asked him about Tim Dunbar. They did not ask him about Tim Leitich. They were asking him about the accident, were they not? They were asking him about who was in the bar with Tim Dunbar. They said, we're here about the accident. And who was in the bar with Tim Dunbar and who left with him? So that was the information that was elicited from Sim's testimony. And, in fact, the next day when Sim said, hey, you didn't tell me about Tim Leitich, he just said, well, you didn't ask me the right questions. And there was no dispute that Sim did ask him. I'm not saying that this behavior is behavior that we might find to be good. I'm simply saying it is not a crime. He did not lie to the police. He answered their questions, not with as much detail as would have maybe been what we would have liked. But he did not lie. He simply was vague. And that is what happened in People v. Thomas. The other thing about this investigation is that it took place extremely quickly. The police are there at 645. And by 1 o'clock, Tim Leitich is with the police station. They have a search warrant the very next day. And it's by, like, 10 o'clock that same morning that they have the video from Lake Point Apartments. So they know that there's three trucks. And there were six or seven trucks in the parking lot of bootleggers that had been left behind. So this is a very quickly moving investigation. And the police never ran the license plates of those trucks that were in the parking lot. This is simply not a case of aiding or conceding a fugitive. By the time Leitich talked to the police officers, he may have been sober, right? He may have been sober, yes. You lose the alcohol over a period of hours. But that is Leitich's responsibility, not Paul Marconi's. The other issue here. Did Marconi supply Leitich with this alcohol? He presumably did. And you say he has no responsibility for that? I'm saying he has no responsibility for whether Leitich is drunk when he talks to the police or not. That is Leitich's responsibility. The police never asked him about Tim Leitich. Is that why Marconi allows people to stay in his apartment overnight to sober up? That appears to be the inference, although Marconi doesn't testify. But that's what Leitich says. Do we live in a blindfolded world here? We can't figure out anything from the facts? Sure, that's why the bar owner allows people to remain in the apartment overnight so that they can sober up. What is at issue here is what the law requires. And the law requires an affirmative act of concealing or aiding a fugitive. And the facts in this case do not sustain the charges. So getting back to my original question, the defendant has to admit that he's guilty before a jury can convict him? No, the defendant does not have to admit that he's guilty. But the witnesses that the state presents have to give other information, different information, to prove it. And that didn't happen here. If there are no further questions. Thank you, counsel. I take the matter under advice.